In re S.E. HORNSBY & SONS SAND AND GRAVEL COMPANY, INC. (EIN 72-0792818), Debtor.

Phillip D. PECK, Trustee, Plaintiff,

v.

Stanley E. HORNSBY and Sheriff, St. Helena Parish, Louisiana, Defendants.

Bankruptcy No. 84–00649.
Adv. No. 84–0154.

United States Bankruptcy Court,
M.D. Louisiana.

Jan. 24, 1986.

David S. Rubin and Bob D. Tucker, Baton Rouge, La., for plaintiff.

Stephen C. Riedlinger, Baton Rouge, La., for Michael E. Hornsby.

Richard E. Holley, Hammond, La., for Stanley E. Hornsby.

REASONS FOR JUDGMENT

WESLEY W. STEEN, Bankruptcy Judge.

**I.  Jurisdiction**

The following jurisdictional rulings were made on February 7, 1985, and have not been appealed. This is a matter within the jurisdiction of the United States District Court for the Middle District of Louisiana under the authority of 28 U.S.C. § 1334(b) and (d). The Court ruled that this is a core matter pursuant to 28 U.S.C. § 157(2)(A) and (E) since it deals with administration of the estate and regaining property of the estate and since control and possession of the property is central and core to any proceeding under the Bankruptcy Code.

**II.  Facts**

The Court makes the following findings of fact:

1.  Before November 19, 1975, and until January 28, 1976, Defendant Stanley E. Hornsby (hereinafter "Stanley") was actively engaged in the business of sand and gravel mining.

2. In connection with that activity, Stanley was the owner of several pieces of heavy equipment used in the sand and gravel business; those pieces of equipment are further identified in Attachment A to this opinion and will hereafter be referred to simply as "the Equipment."

3. On or about November 19, 1975, Stanley formed a Louisiana corporation under the name "S.E. Hornsby & Sons Sand and Gravel Company, Inc."; that corporation is the Debtor corporation herein and will subsequently be referred to as "the Debtor." One thousand shares of stock in the company, representing 100% of the stock outstanding, were issued to Stanley on formation of the corporation.

4. On January 28, 1976, by notarial act of donation, Stanley donated 250 shares of stock in the company to each of his four sons.

5. On and after January 28, 1976, the Debtor actively engaged in the same sand and gravel mining, on the same land, with the same equipment, as Stanley had operated. The land on which the mining was performed belonged and belongs to Stanley. The Debtor's mining activity on that land, after January 28, 1976, was under the authority of a lease executed between Stanley and the Debtor; the lease provides for certain fixed rents and certain additional royalties based on the amount mined.

6. At about the same time that the Debtor's stock was donated by Stanley to his sons, $50,000 was transferred via direct bank transfer from Stanley's account to a new account established in the Debtor's name. There is no documentation establishing the intent of any party in accomplishing this transfer. In May of 1976, an International TD–20 bulldozer was purchased; the $43,000 purchase price was paid by a check issued by the Debtor, and the bill of sale was made out to Stanley Hornsby.

7. Subsequent to January, 1976, three of Stanley's sons have ceased to own stock in the corporation; the only two stockholders that remain are Michael Hornsby and the Defendant, Stanley Hornsby.

8. On or about April 26, 1983, Stanley filed suit in the 21st Judicial District Court alleging that the Debtor had breached a lease between Stanley and the Debtor; the petition sought and obtained a writ of sequestration on the movables of the Debtor.

9. On September 7, 1984, an involuntary petition was filed against the Debtor under Chapter 11 of the Bankruptcy Code. An Order for Relief was entered on October 16, 1984. Prior issues in this case are discussed in 45 B.R. 988.

### III. The Instant Issues

Both the Debtor (through its trustee) and Stanley agree that there are two issues for determination: (i) whether the equipment listed in Attachment A was donated by Stanley to the Debtor as a capital contribution or whether Stanley merely gave to the corporation the right to use that equipment; (ii) whether the bulldozer belongs to Stanley or to the Debtor. There is no dispositive documentation on either of these questions. There is no testimony or other evidence that disposes of the issues. The burden of proof, of course, is on the Complainant/Trustee, to show that the property belongs to the Debtor. If it does, then an order of turnover is appropriate.[1]

### IV. The Trustee's Theory of the Case: The Equipment

The Trustee's theory of the case is that in 1975 Stanley was experiencing difficulties in his marriage; the Trustee further hypothecates that Stanley was anticipating a difficult divorce and community property settlement, and, therefore, Stanley formed the Debtor corporation with the objective of maintaining *de facto* control and benefit from the corporation while at the same time shielding the business assets, income, and control from his spouse. The parties have stipulated that the corporation was formed in November, 1975, and that on January 28, 1976, Stanley and his wife donated all of their stock in the newly formed corporation to their four sons. There ap-

---

1. 11 U.S.C. § 543.

pears to be no disagreement that within two months following the donation of the stock to their sons, Stanley was, in fact, separated from his wife. Stanley's income from sand and gravel mining operations was the subject of alimony litigation in state court. The Trustee asserts that the transcript of Stanley's testimony shows that Stanley asserted in those proceedings that he had donated to the Debtor corporation the equipment that is at issue in this bankruptcy proceeding; but Stanley's attorneys contend that Stanley was confused by the question cited by the Trustee, and that the entire transcript should be read in context to understand that Stanley's response was not accurate.

To prove his theory of the case, the Trustee introduced into evidence the acts of donation dated January 28, 1976, by which Stanley Hornsby and Eula Hornsby donated their stock in the corporation to their four sons. Each son received 25% of the corporate stock: 250 shares; the act of donation recites that the gift to each son had a value of $40,000. The Trustee asserts, therefore, that the total value of the business was stated, by Stanley in the acts of donation, to be $160,000. Since the corporation had no tangible assets (if one excludes the Equipment and cash), and since Stanley's adjusted cost basis in the Equipment was approximately $120,000 at the time, and since Stanley transferred about $50,000 of cash to the corporation, the Trustee asks the Court to infer that Stanley intended a gift (or capital contribution) of the Equipment and cash to the corporation. The inference is generally supported by the only financial records introduced into evidence. Stanley's personal tax return for 1975 shows a book value of the Equipment as approximately $123,500. Stanley's 1976 tax return shows depreciation of approximately $3,500; this is consistent with the Trustee's theory that Stanley continued to own and to operate the Equipment in the business of sand and gravel dredging during only the first month of 1976 and then transferred the Equipment to the Debtor; $3,500 would be approximately one month's depreciation on the Equipment. Taking into consideration approximately $3,500 of depreciation in January, 1976, the book value of the Equipment in question would be approximately $120,000 as of February 1, 1976. Stanley's attorneys introduced into evidence Defendant's Exhibit 3, a transfer slip of the Bank of Greensburg dated February 4, 1976; this transfer slip shows that $50,000 was transferred from Stanley's account to the corporation's account at the end of January. If one adds this $50,000 to the $120,000 of equipment, the total is $170,000, very close to the value of the corporation stipulated by Stanley and Eula in their acts of donation. (Following the Trustee's reasoning, the gifts should have been stated to be $42,500 if valued by the cost basis of these assets.)

Approaching the problem from another way, one might look at the Debtor's first tax return. The corporation elected a fiscal year ending January 31; since the 1976–77 tax return was its first return, the corporation did not show a beginning balance sheet. Its ending balance sheet showed equipment of $240,199. The attached schedules show that all equipment was acquired at the beginning of the year except for a $44,000 bulldozer which was acquired in May. If the cost of this bulldozer is deducted from the total equipment on the corporate tax return for its first fiscal year, the corporate cost basis in its equipment is exactly (to the dollar) the amount of the cost basis of the Equipment to Stanley on December 31, 1975.

The Trustee also supports his theory of the case by showing that Stanley took depreciation on the applicable equipment through and including the month of January, 1976. Subsequent to that he took no depreciation. The Debtor corporation, however, took depreciation thereafter. Stanley's attorneys respond with the allegation that Stanley ceased taking depreciation because he had entered into a gratuitous lease with the Debtor corporation under the terms of which he allowed the corporation to use the Equipment for mining operations without charge, without

term, and with only a vague entitlement to return of the Equipment at some unspecified date and to compensation at an unspecified rate to be paid at an unspecified time. Although not phrased in these terms, Stanley's attorneys argue that Stanley ceased to take depreciation deductions because the property was no longer held for use in the ordinary course of his trade or business or for the production of income.[2]

## V. Stanley's Theory of the Case: The Equipment

Stanley's counsel assert that "... Stanley incorporated the 'business' in November of 1975 with the intent of eventually retiring and turning over its management to his four sons ..." (Stanley's post-trial memorandum, page 5.) To accomplish that objective, he allegedly formed the Debtor corporation and transferred "the business" to it at the end of January, 1976, when he ceased operation as a sole proprietor. Stanley's position is that the only asset that capitalized the Debtor corporation was goodwill; he asserts that he leased to the corporation (for a royalty rental) the right to mine sand and gravel on his land; he asserts that he made a loan of $50,000 cash to the corporation; he asserts that he loaned to the corporation (or to his sons, the allegation is not clear) the use of the Equipment, but that he retained the ownership of the Equipment. Finally, Stanley contends that the Debtor paid $43,000, the purchase price of a bulldozer, and had the bill of sale issued to Stanley individually (and, therefore, he argues, the ownership of the bulldozer vesting in Stanley individually) in partial satisfaction of the $50,000 loan.

The facts presented by Stanley's counsel in support of these contentions are these:

1. Stanley's testimony;
2. Steve Hornsby's testimony;
3. The bill of sale of the bulldozer (showing that it was sold to "Stanley Hornsby");
4. Tax returns for Stanley (calendar 1975 and 1976) and for the corporation (fiscal 1976–77, fiscal year ending January 31);
5. Allegedly inconsistent prior testimony by Michael Hornsby in deposition;
6. The fact that Dale Hornsby sold his 25% of the business for $1,000 to Michael in 1978.

## VI. Conclusions

This is one of those common situations in which a transaction accomplished some years ago is poorly documented or not documented at all. By now time has eroded or destroyed and the parties have lost or destroyed the evidence by which one might measure the character of the event. The transaction might even have been so ambiguous as to defy classification, even when it was effected.

In a traditional dispute at law between two parties, the legal system had a simple method of deciding these imponderables: the burden of proof, the rules of evidence, and the formal requirements for important transactions resulted in a matrix from which one party plucked victory, whether or not one could conclude that justice was done. That relative ease of decision, such that it was, is diminished in the present context by the erosion of the rigid rules of evidence, by the absence of formal requirements for transactions involving movables (even those of substantial value), and by the equitable basis of bankruptcy jurisdiction. But most important, the bankruptcy litigation does not involve two parties to an ancient transaction, but involves *one* of the parties to an ancient transaction plus all of the current creditors and equity holders of

---

**2.** Internal Revenue Code § 167 (26 U.S.C. § 167) provides that a taxpayer may take deductions for the exhaustion or wear and tear of property used in the trade or business or of property held for the production of income. Depreciation deductions are not allowed if the property is held for any other purpose. Stanley's position is that he owned the property and leased it to his sons gratuitously; since the property would, therefore, not have been held for the production of income and would not have been used in Stanley's trade or business, there would have been no depreciation deduction allowed under § 167.

one of the parties to that transaction; some of those creditors/interest holders may have been parties to the ancient transaction, but most usually were not; many of those currently interested in the outcome are frequently not even represented, except perhaps by a trustee or debtor-in-possession. The policy reasons behind the ancient rules of decision, therefore, are frequently difficult to justify.

The parties have each urged the equities of the situation and the need to do justice by recognizing their interests or the interests of unrepresented parties as paramount. But the Court may not go off on its independent way to so what it perceives as justice. The law in our system must be defined by the legislature and applied by the courts according to the burden of proof. The Trustee in this case must prove by a preponderance of the evidence that he is the owner of the Equipment and of the bulldozer; if he does not convince the trier of fact, he loses. But the burden of proof is proof by a preponderance of the evidence, not proof beyond a reasonable doubt.

Applying that standard, the Court is reasonably convinced that the Trustee has proved that he is the owner of the Equipment and of the bulldozer. The Court is so convinced because almost all of the contemporaneous indicia point in that direction. Stanley's case consists almost entirely of an alternative theory of the case supported by only one contemporaneous fact; Stanley's theory of the case has raised reasonable doubt, but that is not the standard.

There is no dispute that Stanley did incorporate the Debtor about the end of 1975.[3] Neither party can show definitively *what* he transferred to the corporation in

exchange for 1,000 shares of stock; neither can either party show definitively that Stanley did *not* transfer either the Equipment or the cash to the corporation as a capital contribution. There is no contemporaneous evidence of *when* assets were transferred to the corporation in exchange for stock or whether Stanley was actually issued 1,000 shares of stock.[4]

On or about January 31, 1976, Stanley stopped doing business with certain assets; he donated stock in his corporation to his sons, and the corporation started doing Stanley's business. Stanley stopped using the Equipment in his business, and the corporation started using those assets. Stanley stopped depreciating assets, and the corporation started; not only did the corporation begin depreciating the assets, it began just where Stanley left off. Fifty thousand dollars was withdrawn from Stanley's bank account and was deposited in the corporation's account; no documentation was prepared. Stanley signed an authentic act that said that the corporation was worth approximately the sum of the adjusted basis of the Equipment plus the cash.

■ Viewing this evidence dispassionately and objectively, the Court concludes that a preponderance of the contemporaneous evidence indicates that Stanley exchanged cash and the Equipment for 1,000 shares of stock. Having heard the witnesses and judged their credibility, the Court concludes that Michael and Dale Hornsby (and particularly Dale) were the more credible witnesses; their testimony supports the conclusion reached by examining the contemporaneous evidence. Stanley's attorneys have not presented so much conflict-

---

**3.** It is not critical whether he did so to retire and to pass along the business to his sons or whether he wanted to maintain income and control of the business while insulating it from a divorce proceeding.

**4.** The procedure adopted by the Louisiana Business Corporation Law (La.R.S. 12:1 *et seq.*) is that an incorporator (who need not be or become a shareholder: La.R.S. 12:21, 52 *et seq.*) files Articles of Incorporation (12:24,25).

Shares are then sold for cash or assets (12:52). The Articles of Incorporation (included in Exhibit "B") show an initial corporate capital of $1,000, or $1 per share. There is no requirement that corporate capital be specified in the Articles. If it is so specified, the effect is merely to prevent the corporation from doing business until that sum has been paid in; (12:26). There is no effect on the amount that may be paid into the corporation in exchange for stock (12:52).

ing evidence as they have presented ambiguous evidence that does support their alternative hypothesis; but the ambiguity of their evidence means that it either supports the Trustee's theory or has little or no probative value opposed to the Trustee's theory.

A. Stanley's 1975 tax return shows $505,837 in gross receipts, and the corporate return shows $340,751 in gross receipts for fiscal 1976. Stanley asserts that this shows a $160,000 "goodwill value" for a corporate shell without any other asset. It is a good alternate theory, but hard to accept.

First, Stanley asserts no calculation that shows how $160,000 was derived as the value of the business except to say that the gross receipts of the business supports a goodwill value in that amount. But to suggest an alternative theory is not proof that stands up well against the Trustee's logical calculation.

Second, it is risky to value businesses by considering only gross receipts; a far more important figure is net income. With $505,837 in 1975 gross receipts, the business netted only about $47,000. Even that did not include a salary for its sole proprietor, Stanley. Someone valuing goodwill would normally be interested in net earnings, after deduction for the value of the proprietor's services; only by doing so could one compare the value of the subject businesses with like businesses that must pay managers a salary. In the last month of Stanley's management (January, 1976), the "business" *lost* $1,955 on gross receipts of $26,600. In 1976, on gross receipts of $340,751, the corporation netted $17,380, including only $12,000 in officers' salaries. In 1977, the corporation had a $49,886 *loss* on gross receipts of $85,368.

B. The third page of Stanley's post-trial memorandum states that Stanley was in control of the business until January 28, 1976, and that the incorporation was November, 1975; from this counsel concludes that the Equipment was not transferred in January, 1976, because Stanley could have done it in November, 1975. First, this is not evidence, and, therefore, does not weigh in a determination of a preponderance of the evidence. Second, the Court does not understand the argument. The fact that an event could have occurred earlier is not proof that it did not happen later.

C. Stanley's post-trial memorandum then asserts that no transfer of Equipment to the corporation was necessary because Stanley allowed the corporation the use of the Equipment. First, the Court is reluctant to accept a theory that Stanley maintained ownership while transferring possession, control, and use, without term, without fee, and without written agreement. Transfer of possession with retention of ownership has for centuries been highly suspect. Having heard the testimony of both sides, the Court simply finds the testimony presented by the Trustee to be credible and finds Stanley's incredible. Second, the fact (even if accepted) that there was no need for something is not evidence that it was not done; it may raise a reasonable doubt, but it is not conclusive.

## VII. The Bulldozer

■ Turning to the bulldozer, the issue is easier. The corporation paid Dick Henley $43,000 for a bulldozer. Stanley claims that the bulldozer is his (i) because he claims that he "loaned" $50,000 to the corporation and that the bulldozer was a payback method, and (ii) because he asserts that the bill of sale was made out to him.

First, the Court has already dismissed the loan theory because the preponderance of the evidence supports the "contribution to capital" theory. Of the three significant witnesses (Stanley, Michael, and Dale) who testified on the issue, two witnesses, including the most credible witness (Dale, particularly because he was the most disinterested), testified that there was no loan. In addition, for reasons previously discussed, the contribution to capital theory is supported by Stanley's own gift valuation. By a preponderance of the evidence, the Court accepts the contribution to capital theory.

Second, the bill of sale does not evidence what Stanley's counsel claims that it evidences. It does not serve as "title" in any event, but merely may evidence contemporaneous intent. Next, it is not a bill of sale to Stanley. The form is for an automobile. The line for the name of the vendee is *left blank.* Although Stanley E. Hornsby apparently signed on the vendee's signature line, the fact remains that the name of the purchaser is blank. It is equally possible: (i) that Stanley was the vendee, as Stanley claims, or (ii) that the Debtor was the vendee with Stanley acting as its agent, as the Trustee claims. Given that the purchase was paid for by a corporate check and that possession, use, and control of the property has continuously been with the Debtor, the Court finds by a preponderance of the evidence (including an assessment of the credibility of the witnesses) that the Debtor was the vendee.

### VIII. Conclusion

For reasons assigned, the Court has rendered judgment in favor of the Trustee.

## EXHIBIT A

### SCHEDULE OF EQUIPMENT

1. International TD–20 Bulldozer
2. Galion yellow road grader—block number 6.8P
3. Indeterminate number of $2 \times 2 \times \frac{1}{4}$ angle iron—at least 3–5 pieces, but including all currently on site
4. 1 Koehning model 405 Dragline—NOC 13509, with $1\frac{1}{4}$ yd. drag bucket
5. 2 International loaders:
   a. 1976 model Hough loader S/N 65C3460310U0004530
   b. 1975 model Hough loader S/N 65C3460310U003961X
6. Dredgers:
   a. Front Dredge, motor #149598
   b. Back Dredge, motor #149596

      Both dredges complete with Thomas Foundry pumps, V–12 Cummins engines, Berkly water pumps, and all accessories, including all pipe, floats, chain bands, and sleeves; and barges on which mounted

      Est. # of accessories
         19 pipe
         17 floats
         87 chain bands
         13 sleeves
   c. Additional dredges not operable
7. 4 washer plants
   a. 3 standard washers
   b. 1 large washer constructed of 2 smaller plants
8. Skid tanks (approximately 3)
9. 1 Ford 750 Red Dump Truck, 8 cu. yd., S/N F75FVP55950
10. 2 Lincoln Arc-welders
    a. 1 ea., SA–200, S/N A–//8444
    b. 1 ea., description and S/N unknown
11. 2 Victor acetylene cutting rigs
12. 2 drums oil
13. All pump shells (1 or 2)
14. All impellors (1–10)
15. Bateaus (1 or 2)

SCHEDULE OF EQUIPMENT—Continued

16. Conveyor belts
    a.  2, 100' belts
    b.  1, 80' belt
    c.  1, 70' belt (possibly)
17. Istrouma sand pump (may be mounted on barge and equipped with 325 HP Cummins engine
18. 1 8×10" Istrouma foundry pump
19. 1 truck tool box with tools (includes 3 complete sets of and wrenches, sockets and pipe wrenches) and miscellaneous parts around tool box
20. 2 shakers
    a.  Cedar Rapids rotary shaker
    b.  Diestesr Rotary shaker
21. All sheets of 5' × 20' × 3/16" plate iron (approximately 8)
22. All 8" pipe (approximately 4000)
23. All 8" dredge sleeves (approximately 55)
24. All chain clamps to connect dredge sleeves to pipe (approximately 200)
25. All 10" pipe (500')
26. All 8" pump wear lines (front and rear) (approximately 7)
27. All 8" pump casings (approximately 7)
28. All steel and plastic floats to support 8" pipe
29. All 30" diameter pipe (approximately 60')
30. All 18" diameter pipe (approximately 80')
31. All fuel and oil filters
32. 3 10:00 × 20 spare tires and rims